IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| J. Bradley Amick and Taylor Kitchens, individually and behalf of all those similarly situated,<br><br>            Plaintiffs,<br><br>vs.<br><br>Lexington County,<br><br>            Defendant. | C/A No. 3:23-cv-0336-CMC |
| Chris Kitchens,<br><br>            Plaintiff,<br><br>vs.<br><br>Lexington County,<br><br>            Defendant. | C/A No. 3:22-cv-2897-CMC |

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Chris Kitchens brought this action in the Lexington County, South Carolina, Court of Common Pleas on July 18, 2022, against his former employer, Defendant Lexington County. Plaintiff alleges Defendant improperly denied him compensation provided to eligible workers under the American Rescue Plan Act of 2021 ("ARPA"). Defendant removed the action to this court pursuant to federal question jurisdiction on August 31, 2022. *See* 28 U.S.C. § 1331. On December 9, 2022, Plaintiffs J. Bradley Amick and Taylor Kitchens, individually and on behalf of all those similarly situated, filed a complaint in the Court of Common Pleas for Lexington County, alleging the same injury on behalf of a purported class of similarly situated former Lexington County

employees. Defendant removed the second action on January 26, 2023. Because Chris Kitchens is a member of the putative class, these two cases have been consolidated, with the class action being the lead case. An amended complaint was filed on September 8, 2023. Plaintiffs assert the following causes of action: [Violation of the] South Carolina Payment of Wages Act, S.C. Code Ann. §§ 41-10-10 to -110 ("SCPWA") (First Cause of Action); Money Had and Received (Second Cause of Action); Violation of the Guarantee to Equal Protection of the Law (Third Cause of Action); Unlawful Taking (Fourth Cause of Action); Violation of Due Process (Fifth Cause of Action); Declaratory Judgment (Sixth Cause of Action); and Injunctive Relief (Seventh Cause of Action). Plaintiffs seek compensatory and punitive damages, a judgment declaring Defendant's decision unenforceable as to Plaintiffs; an injunction barring the application of Defendant's decision to Plaintiffs; monetary damages in the amount of three times their unpaid wages; and reasonable attorneys' fees and costs.

This matter now is before the court on cross-motions for summary judgment filed in each case on January 16, 2024. Both parties filed responses in opposition on January 30, 2024. Defendant filed a reply to Plaintiffs' response on February 6, 2024. Unless otherwise noted, the court will refer in this order only to docket numbers appearing in the lead case.

## I. FACTS

The facts generally are not disputed. Rather, at issue is whether Defendant's distribution of ARPA premium pay only to "current employees" comports with the federal and state Constitutions and state law.

Congress enacted the ARPA in March 2021 "to address the continued impact of COVID-19 (i.e., coronavirus disease 2019) on the economy, public health, state and local governments,

individuals, and businesses." Pub. L. 117-2, 135 Stat. 4 (2021). Section 9901 of the ARPA amended Title VI of the Social Security Act to establish the Coronavirus State and Local Fiscal Recovery Funds. The Coronavirus State Fiscal Recovery Fund ("CSFRF") is defined in § 602 of the Act (codified at 42 U.S.C. § 802). In § 602, Congress appropriated $219,800,000,000 through December 31, 2024 "for making payments under this section to States, territories, and Tribal governments to mitigate the fiscal effects stemming from the public health emergency with respect to the Coronavirus Disease (COVID–19)[.]"

Congress established the Coronavirus Local Fiscal Recovery Fund ("CLFRF") in § 603 of the Act (codified as 42 U.S.C. § 803). In this section, Congress appropriated $130,200,000,000 through December 31, 2024, "for making payments under this section to metropolitan cities, nonentitlement units of local government, and counties to mitigate the fiscal effects stemming from the public health emergency with respect to the Coronavirus Disease (COVID–19)." From this appropriation, $65,100,000,000 was reserved to make payments directly to counties "in an amount which bears the same proportion to the total amount reserved under this paragraph as the population of each county bears to the total population of all such entities[.]" 42 U.S.C. § 803(3)(A). CLFRF funds are dedicated:

> (A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID-19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;
>
> (B) to respond to workers performing essential work during the COVID-19 public health emergency by providing premium pay to eligible workers of the metropolitan city, nonentitlement unit of local government, or county that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;

> (C) for the provision of government services to the extent of the reduction in revenue of such metropolitan city, nonentitlement unit of local government, or county due to the COVID-19 public health emergency relative to revenues collected in the most recent full fiscal year of the metropolitan city, nonentitlement unit of local government, or county prior to the emergency; or
>
> (D) to make necessary investments in water, sewer, or broadband infrastructure.

42 U.S.C. § 803(c)(1).

> As relevant to this case, an "eligible worker" is defined as
>
> those workers needed to maintain continuity of operations of essential critical infrastructure sectors and additional sectors as each chief executive officer of a metropolitan city, nonentitlement unit of local government, or county may designate as critical to protect the health and well-being of the residents of their metropolitan city, nonentitlement unit of local government, or county.

*Id.* § 803(g)(2).

> "Premium pay" means
>
> an amount of up to $13 per hour that is paid to an eligible worker, in addition to wages or remuneration the eligible worker otherwise receives, for all work performed during the COVID-19 public health emergency. Such amount may not exceed $25,000 with respect to any single eligible worker.

*Id.* (incorporating definition from § 802(g)(1)(3)).

The Secretary of the Treasury promulgated rules governing pandemic relief programs in 31 C.F.R., Subt. A, Part 35. In 31 C.F.R. § 35.6, the Secretary outlined eligible uses for which funds could be utilized. As relevant here, § 35.6(c) provides:

> Providing premium pay to eligible workers. A recipient may use funds to provide premium pay to eligible workers of the recipient who perform essential work or to provide grants to eligible employers that have eligible workers who perform essential work, provided that any premium pay or grants provided under this paragraph (c) must respond to eligible workers performing essential work during the COVID–19 public health emergency.
>
> "Eligible workers" means

> workers needed to maintain continuity of operations of essential critical infrastructure sectors, including health care; emergency response; sanitation, disinfection, and cleaning work; maintenance work; grocery stores, restaurants, food production, and food delivery; pharmacy; biomedical research; behavioral health work; medical testing and diagnostics; home- and community-based health care or assistance with activities of daily living; family or childcare; social services work; public health work; vital services to Tribes; any work performed by an employee of a State, local, or Tribal government; educational work, school nutrition work, and other work required to operate a school facility; laundry work; elections work; solid waste or hazardous materials management, response, and cleanup work; work requiring physical interaction with patients; dental care work; transportation and warehousing; work at hotel and commercial lodging facilities that are used for COVID–19 mitigation and containment; work in a mortuary; and work in critical clinical research, development, and testing necessary for COVID–19 response.

31 C.F.R. § 35.3.

> "Essential work" means work that:
>
> (1) Is not performed while teleworking from a residence; and
>
> (2) Involves:
>
> (i) Regular in-person interactions with patients, the public, or coworkers of the individual that is performing the work; or
>
> (ii) Regular physical handling of items that were handled by, or are to be handled by patients, the public, or coworkers of the individual that is performing the work.

*Id*.

> "Premium pay" means
>
> an amount of up to $13 per hour that is paid to an eligible worker, in addition to wages or remuneration the eligible worker otherwise receives, for all work performed by the eligible worker during the COVID–19 public health emergency. Such amount may not exceed $25,000 in total over the period of performance with respect to any single eligible worker. Premium pay may be awarded to non-hourly and part-time eligible workers performing essential work. Premium pay will be considered to be in addition to wages or remuneration the eligible worker otherwise receives if, as measured on an hourly rate, the premium pay is:
>
> (1) With regard to work that the eligible worker previously performed, pay and

> remuneration equal to the sum of all wages and remuneration previously received plus up to $13 per hour with no reduction, substitution, offset, or other diminishment of the eligible worker's previous, current, or prospective wages or remuneration; or
>
> (2) With regard to work that the eligible worker continues to perform, pay of up to $13 per hour that is in addition to the eligible worker's regular rate of wages or remuneration, with no reduction, substitution, offset, or other diminishment of the worker's current and prospective wages or remuneration.

*Id.*

Defendant received a $58,028,000 allocation. The funds were distributed in two equal tranches, one in 2021 and the other in 2022. On October 12, 2021, the Lexington County Council authorized the disbursement of "premium pay" to eligible workers who were employed from January 27, 2020 to March 21, 2021. On October 15, 2021, Defendant announced the disbursement of premium pay to Defendant's employees whose positions had been designated by Defendant as essential. Defendant reported it would use a calculation based on a combination of role, response, and the number of pay periods worked during the initial response to the pandemic, which was determined to be 30 pay periods during the January 27, 2020 to March 21, 2021 look-back period established by Defendant under the applicable guidelines. Defendant determined "[e]ligible employees must be employed by the County on the date that premium pay disbursements are processed in payroll in order to receive premium pay. Otherwise eligible employees who leave employment with the County for any reason prior to October 31, 2021, will not receive premium pay." Mot. for Summ. J. (Ex. 5), ECF No. 38-6.

In April 2022, the Lexington County Council voted to approve a transfer of $18,700,000.00 for premium employee pay and retention sign-on for identified positions. On April 22, 2022, Defendant notified essential employees of a second distribution using a calculation based on a

combination of role and response during the period of March 21, 2021 through March 20, 2022. Defendant again cautioned that eligible employees must be employed by Defendant on the date the premium pay disbursements were processed in payroll, which was May 13, 2022. Def.'s Mot. for Summ. J. (Ex. 6), ECF No. 38-7. Defendant again noted that it had complete and exclusive discretion with regard to the determination of pay category placement and eligibility.

    Plaintiffs contend they fall squarely within the definitions set out by statute and regulation for "eligible workers" who performed "essential work" during the COVID-19 public health emergency. Plaintiff Chris Kitchens was a deputy sheriff until July 30, 2021, when he retired. Plaintiff Chris Kitchens was an eligible worker during the entire look-back period from January 27, 2020 to March 21, 2021, and for approximately four months of the March 21, 2021 to March 20, 2022 look-back period. However, because he was not employed on October 31, 2021 or May 13, 2022, he received no premium pay. Plaintiff Amick served as Battalion Chief of Lexington County Fire Service until he retired on October 3, 2021. Thus, he was an eligible worker during the entire January 27, 2020 to March 21, 2021 look-back period and for approximately six months of the March 21, 2021 to March 20, 2022 look-back period. Like Plaintiff Chris Kitchens, Amick was not on the October 31, 2021 or May 13, 2022 payrolls, so received no premium pay. Plaintiff Taylor Kitchens was employed as a senior deputy and school resource officer until April 29, 2022, when she resigned to continue her education. Plaintiff Taylor Kitchens was an eligible worker during the entirety of both look-back periods. Plaintiff Taylor Kitchens received her share of the first disbursement on October 31, 2021; however, because she was not employed on May 13, 2022, she did not receive premium pay for the second look-back period.

## II. LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Ohio Valley Env't Coal., Inc. v. Maple Coal Co.*, 808 F. Supp. 2d 868, 877 (S.D.W. Va. 2011)(citing Fed. R. Civ. P. 56(a)). When cross-motions for summary judgment are filed, "'the fact that both parties simultaneously are arguing that there is no genuine issue of fact does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit.'" *Id.* (quoting *Podberesky v. Kirwan*, 38 F.3d 147, 156 (4th Cir.1994)). In considering a motion for summary judgment, the Court will not "'weigh the evidence and determine the truth of the matter [.]'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)).

## III. DISCUSSION

The threshold question is whether Plaintiffs are entitled to premium pay for the same reasons other eligible workers received premium pay under the ARPA. If not, all the causes of action asserted by Plaintiffs fail. Plaintiffs contend Defendant violated their rights to equal protection under the law by arbitrarily classifying Plaintiffs as "former employees" and treating them differently from similarly situated "current employees" without any rational basis for doing so. The court turns to Plaintiffs' Equal Protection claim.

A.      **Violation of Right to Equal Protection** (Third Cause of Action)

Plaintiffs bring this claim under S.C. Const. art. I, § 3, which provides, in part, that no person shall be denied the equal protection of the laws. Success on an equal protection claim requires a

showing that similarly situated persons received disparate treatment. *Richland Cnty. Sch. Dist. 2 v. Lucas*, 862 S.E.2d 920, 923 (S.C. 2021)(quoting *Grant v. S.C. Coastal Council*, 461 S.E.2d 388, 391 (S.C. 1995)). South Carolina courts generally analyze equal protection challenges under one of three standards: (1) rational basis; (2) intermediate scrutiny; or (3) strict scrutiny. *Doe v. State*, 808 S.E.2d 807, 814 (S.C. 2017)(citing *Denene, Inc. v. City of Charleston*, 596 S.E.2d 917, 920 (S.C. 2004)). If, as in this case, "'the classification does not implicate a suspect class or abridge a fundamental right, the rational basis test is used.'" *Id.* (quoting *Denene*, 596 S.E.2d at 920.) "'Under the rational basis test, the requirements of equal protection are satisfied when: (1) the classification bears a reasonable relation to the legislative purpose sought to be affected; (2) the members of the class are treated alike under similar circumstances and conditions; and (3) the classification rests on some reasonable basis.'" *Id.* (quoting *Denene*, 596 S.E.2d at 920). "'Those attacking the validity of legislation under the rational basis test of the Equal Protection Clause have the burden to negate every conceivable basis which might support it.'" *Id.* (quoting *Boiter v. S.C. Dep't of Transp.*, 712 S.E.2d 401, 403-04 (S.C. 2011)).

  **1.**   **<u>Plaintiffs' Arguments</u>**. Plaintiffs contend they satisfy the federal requirements under the ARPA and the Department of the Treasury's guidance for receiving premium pay, i.e., they were eligible workers who performed essential work for Defendant during the COVID-19 public health emergency during the January 27, 2020 to March 21, 2021 and March 21, 2021 to March 20, 2022 periods. Plaintiffs state they risked their health and well-being along side those essential workers who received premium pay for the designated periods; however, they were treated differently because they were not on the payroll on the designated dates. Plaintiffs contend Defendant's proffered reasons for creating two different classifications are merely post-hoc justifications at odds

with Defendant's stated intent of compensating its essential employees for work already performed. Plaintiffs observe:

> Throughout this litigation, Defendant has cited the following rationales for providing premium pay to current employees only: (1) it was operating with finite resources; (2) it wanted current employees to benefit from the receipt of premium pay; (3) expanding the pool of recipients to include former employees would shrink the amount of premium pay available to current employees; (4) Defendant does not benefit in any tangible way from providing discretionary payments to former employees; and (5) administrative burden of providing checks or direct deposits to those no longer with the County.

Pl.'s Mot. for Summ. J., ECF No. 37 at 26.

As to operating with finite resources, Plaintiffs provide a pie chart indicating Defendant has spent only $35,508,056.18 of the $58,028,685.00 allocated to it. Plaintiffs' statistics indicate 55 percent of the funds allocated to Defendant remain uncommitted to authorized uses. *Id.* at 27. Plaintiffs argue Defendant's position that premium pay is a forward-looking retention bonus for current employees is contrary to various documents created by Defendant. *Id.* at 28. *See, e.g.*, Memorandum to All Lexington County Employees dated October 15, 2021, ECF No. 37-2 at 1 ("Lexington County recognizes the extraordinary efforts of its employees who provided essential services to the County's citizens and who supported their fellow employees during the County's initial responses to the Covid pandemic. In recognition of these efforts, and in accordance with the authorized uses . . . of funding from the State and Local Fiscal Recovery Fund ('SLFRF'), the County will provide premium pay to County employees whose positions have been designated by the County as essential. The County will use a calculation based on a combination of role, response, and the number of pay periods worked during the County's initial responses to the Covid pandemic."). *Id.* at 28. Plaintiffs contend Defendant made the same representations to the United

10

States Department of the Treasury. *See* Lexington County Recovery Plan, State and Local Fiscal Recovery Funds (2021 Report), ECF No. 37-11; Lexington County Recovery Plan, State and Local Fiscal Recovery Funds (2023 Report), ECF No. 37-12. Plaintiffs contend Defendant has been clear that its intention was to compensate all essential workers for past work rendered. Plaintiffs also dispute Defendant's position that including "former employees" in the premium pay distributions would have decreased the amounts available to current employees, given the funds available for distribution. Finally, Plaintiffs characterize Defendant's citation to the burden on human resources to forward premium payments to former employees as lazy and not rational.

    2.    **Defendant's Arguments**. The gravamen of Defendant's cross-motion for summary judgment is that it had absolute discretion as to how it allocated the ARPA funding. Defendant observes it was not under any obligation to use the funds to provide premium pay to eligible workers in the first instance. Defendant further asserts it had discretion in setting all parameters not specifically delineated by applicable statutes or regulations, which, for premium pay, are a per-person cap and a proviso premium pay not be paid to employees who telecommute. Defendant commenced with the goal of allocating $8.2 million, or roughly 14%, of the ARPA funds toward premium pay. Defendant decided any eligible worker employed during the recovery periods who was employed on the date payment was made would receive premium pay. Defendant states it would not benefit in any way by providing premium pay to former employees, and disbursing premium pay only to current employees was consistent with Defendant's commitment to provide the greatest benefit to the county as a whole. Defendant further reasoned paying only current employees would avoid the administrative burden of tracking down former employees, confirming current addresses, obtaining W-4 tax withholding information, and generating a manual check for each

former employee.

Defendant allocated $190.00 per pay period to Tier 1 employees and $155.00 per pay period to Tier 2 employees. Defendant reports employees were paid regardless of the number of pay periods they actually worked: "So long as they worked at least one pay period during the relevant time, they received the full bonus." Mot. for Summ. J. at 6-7, ECF No. 38-1.

Defendant also disputes Plaintiffs' contention there exist unallocated ARPA funds. According to Lexington Deputy County Administrator Chris Murrin:

> To date, Lexington County has formally approved fourteen SLFRF projects, allocated SLFRF funds for all fourteen of these projects, fully funded with SLFRF funds four of these projects, and partially funded with SLFRF funds ten of these projects. The total amount of SLFRF funds allocated for these SLFRF projects is approximately $36.9 million dollars. Of the approximately $58 million in SLFRF funds received by Lexington County, approximately $21 million remains unallocated at the present time. Independent from the above referenced fourteen approved projects, Lexington County received project applications for SLFRF funds from a large number of entities for a large number of projects, and has heard presentations from some of these entities. The project applications of some of these entities were identified informally as "warrants further consideration." Lexington County has identified five proposed projects seeking approximately $12 million that the County is carefully evaluating and that the County expects to present to County Council for consideration. If these five projects and the corresponding SLFRF funds being sought are approved, this would push the SLFRF funds allocated figure to approximately $48.9 million, and would leave approximately $9 million in unallocated funds.
>
> Lexington County fully intends to and will allocate 100% of the SLFRF funds received by the County by December 31, 2024. Lexington County fully intends to and will expend 100% of the SLFRF funds received by the County by December 31, 2026.

Def.'s Mot. in Reply to Pls.' Resp. to Def.'s Mot. for Summ. J., ECF No. 43 at 2-3.

**B.     The Court's Ruling**

The court first will dispense with Defendant's peripheral arguments regarding equal protection. Defendant commences by submitting the case should be dismissed because Plaintiffs

12

actually seek recovery under the ARPA and not pursuant to an equal protection challenge. Courts addressing the issue, uniformly have recognized the ARPA does not provide for a private right of action. This court recognized the ARPA does not provide for a private right of action in the *Kitchens* case. *See* Order on Subject Matter Jurisdiction, ECF No. 26 at 5 (citing *Baxter v. United States*, Civil Action No. 2:22-00490, 2023 WL 2418369, at *3 (S.D.W. Va. Feb. 16, 2023) ("[N]either the CARES Act nor the CAA nor the ARPA provide for a private right of action.")(collecting cases), *Report and Recommendation adopted by Baxter v. United States*, Civil Action No. 2:22-CV-00490, 2023 WL 2411027 (S.D.W. Va. Mar. 8, 2023)). Plaintiffs respond they have never attempted to assert a private right of action under the ARPA. In *Kitchens*, Plaintiff Kitchens conceded the lack of a private right of action arising from the ARPA. Pl.'s Br. on Fed. Subject Matter Jurisdiction, ECF No. 23 at 10. The court declines to construe Plaintiffs' complaint as attempting to seek recovery under the ARPA.

Relying on *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591 (2008). Defendant submits public employer discretionary decisions are not subject to equal protection scrutiny. In *Engquist*, the question was whether a public employee can state a claim under the Equal Protection Clause by alleging she was arbitrarily treated differently from other similarly situated employees under a "class-of-one" theory; that is, she was treated differently for arbitrary, vindictive, and malicious reasons. *Engquist*, 553 U.S. at 594-95. The Court found state actions "by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Id.* at 603. According to the Court, "[i]n such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." *Id.* Consequently, treating employees differently "is simply to exercise the broad

discretion that typically characterizes the employer-employee relationship." *Id.* at 605. The Court was quick to note the Equal Protection Clause "is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently." *Id.* The complaint at issue does not arise under the "class-of-one" theory, and *Engquist* is inapposite.

Defendant also contends Plaintiffs' third cause of action fails because it was not brought under the proper federal civil rights statutory mechanism, which Defendant asserts is 42 U.S.C. § 1983. A civil action under § 1983 "creates a private right of action to vindicate violations of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012). To state a claim under § 1983, a plaintiff must allege two essential elements: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the alleged violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). A local government may be sued under § 1983 when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury [for which] the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

Rather than proceeding under § 1983, Plaintiffs chose instead to bring their complaint under the South Carolina Constitution. As Defendant observes, the South Carolina Constitution does not provide for monetary damages for civil rights violations. *Palmer v. State*, 829 S.E.2d 255, 260 (S.C. Ct. App. 2019). However, a litigant may invoke the South Carolina Uniform Declaratory Judgments Act, S.C. Code Ann. §§ 15-53-10 to -120, to request a court to declare the constitutionality of a legislative action. *See, e.g.*, *Richland Cnty. Sch. Dist. 2*, 862 S.E.2d at 923. Plaintiffs allege

Defendant's decision to not compensate former employees was arbitrary and capricious and "must be declared void." Comp. ¶ 76, ECF No. 1-1. Plaintiffs seek a declaratory judgment "defining the rights, privileges, and duties of and between the parties pursuant to South Carolina Code § 15-53-10, et seq." *Id.* ¶ 86.

A court treats a removed state-court declaratory judgment action as if the plaintiff had invoked the Federal Declaratory Judgment Act, 28 U.S.C. § 2201. *Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 261 n.3 (4th Cir. 2013). Section 2201 provides, with certain limitations, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." As for the merits, the court will apply the substantive law of South Carolina as articulated in *Richland County School District 2* and other state equal protection opinions.

    **1.**    **Whether the classification bears a reasonable relation to the legislative purpose sought to be affected**.

A classification bears a rational relationship to its purpose as long as there is some evidence that it will further a legitimate purpose. *SPUT at Williams Brice Owners Ass'n, Inv. v. Lalla*, 781 S.E.2d 115, 123 (S.C. Ct. App. 2015). The Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the facts on which the classification is based rationally may have been considered to be true by the decision maker, and the relationship of the classification to the goal is not so attenuated as to render the distinction arbitrary or irrational. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

As set forth above, Congress authorized ARPA funds to be used "to respond to workers performing essential work during the COVID–19 public health emergency by providing premium pay to eligible workers[.]"  42 U.S.C. § 803(c)(1)(b). The Secretary of the Department of the Treasury noted premium pay was available to essential workers "in recognition of their sacrifices over the last year." 86 Fed. Reg. 26786-01.  In this case, Defendant made the decision to use a portion of ARPA funds for premium pay in order to "recognize[] the extraordinary efforts of its employees who provided essential services to the County's citizens and who supported their fellow employees" during the County's response to the COVID-19 pandemic.  Mem. to Lexington Cnty. Employees dated October 15, 2021, ECF No. 37-2; Mem. to Lexington Cnty. Employees dated April 22, 2022, ECF No. 37-5.  These statements demonstrate the intent of both Congress and Defendant to recognize employees who put themselves in harm's way to ensure the continued operation of crucial governmental services.

**2.     Whether the members of the class are treated alike under similar circumstances and conditions.**

The *sine qua non* of an equal protection claim is a showing that similarly situated persons received disparate treatment. *Grant v. S.C. Coastal Council*, 461 S.E.2d 388, 391 (S.C. 1995). Here, the only difference between Plaintiffs and those who received premium pay is the fact Plaintiffs were not employed with Defendant at the time premium pay was distributed.

**3.     Whether the classification rests on some reasonable basis.**

The South Carolina Supreme court has stated:

> We are reluctant to declare a statute [or here, a county classification] unconstitutional. *In re Treatment and Care of Luckabaugh*, [] 568 S.E.2d 338, 344 (S.C. 2002). Hence, we will make every presumption in favor of finding it constitutional. *Id.*  Moreover, if possible, we must construe a statute so that it is

> valid. *State v. Neuman*, [] 683 S.E.2d 268, 271 (2009). The party challenging the statute bears the heavy burden of proving that "its repugnance to the constitution is clear and beyond a reasonable doubt." *Luckabaugh*, [] 568 S.E.2d at 344.

*Bodman v. State*, 742 S.E.2d 363, 368 (S.C. 2013) (official reporter cites omitted).

"[T]he classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Town of Iva v. Holley*, 649 S.E.2d 108, 110 (S.C. Ct. App. 2007).

Defendant asserts it is not unusual for employers to require employees be employed at the time bonuses are paid. Mot. for Summ. J., ECF No. 38-1 at 19 (citing cases). It is true, as Defendant's cases reflect, employers routinely condition the payment of bonuses or commissions on the current employment of the employee via written policy or employment handbooks. Defendant's characterization of premium pay appears to be in accord with federal law. According to the Fair Labor Standards Act ("FLSA"), a bonus may arise when "an employer retains discretion both as to the fact of payment and as to the amount until a time quite close to the end of the period for which the bonus is paid. The sum, if any, to be paid as a bonus is determined by the employer without prior promise or agreement. The employee has no contract right, express or implied, to any amount." 29 C.F.R. § 778.211(b) (discussing manner of determining regular rate of remuneration for employment).

> Examples of bonuses that may be discretionary include bonuses to employees who made unique or extraordinary efforts which are not awarded according to pre-established criteria, severance bonuses, referral bonuses for employees not primarily engaged in recruiting activities, bonuses for overcoming challenging or stressful situations, employee-of-the-month bonuses, and other similar compensation. Such bonuses are usually not promised in advance and the fact and amount of payment is in the sole discretion of the employer until at or near the end of the period

to which the bonus corresponds.

*Id.* § 778.211(d).

It is not disputed Defendant retained discretion under 31 C.F.R. § 35.6(c) to determine, in the first instance, whether to expend a portion of its ARPA funding on employees who provided essential services during the pandemic. The issue becomes whether Defendant's discretion extended beyond the initial decision whether to segregate an amount of its ARPA funds for premium pay. The court concludes that it did. As Defendant points out, the ARPA, its implementing regulations, and Department of Treasury guidance all contain discretionary language:

- "local governments **that accept** a payment . . ." 31 C.F.R. § 35.2 (emphasis added). 31 C.F.R. § 35.5 (unused funds must be returned).

- "a recipient **may** use funds for one or more of the purposes described in paragraphs (b) through (f) of this section." 31 C.F.R. § 35.6

- Premium pay means an amount **of up to** $13 per hour . . . **[per] eligible worker**, in . . . Premium pay **may** be awarded to non-hourly and part-time eligible workers performing essential work. . . . **up to $13 per hour** with no reduction, . . . . **of up to** $13 per hour . . . ." 31 C.F.R. § 35.3 (emphasis added).

- "recipients **may** provide Premium Pay retrospectively . . . for work performed . . . ." Frequently Asked Questions (FAQs)." Treasury's response to FAQ # 4.5  ARPA SLFRF Final Rule – Frequently Asked Questions (FAQ # 4.5) (Emphasis added.)

- SLFRF **may** be used to provide Premium Pay to eligible workers performing essential work during the pandemic . . . ." FAQ # 5.1

- "Yes. Treasury **encourages** recipients to **consider** providing Premium Pay retroactively for work performed during the pandemic . . ." ARPA SLFRF Final Rule – Frequently Asked Questions (FAQ # 5.1) (emphasis added) Treasury's response to FAQ # 5.2.

- "**[T]he current definition is flexible** enough to **give recipients the ability to tailor their Premium Pay programs to meet their needs** while ensuring

>   that programs focus on sectors where workers were forced to shoulder substantial risk as a result of the COVID-19 pandemic." Coronavirus State and Local Fiscal Recovery Funds, 87 F.R. 4338-01.

Mot. for Summ. J., ECF No. 38-1 at 10-11 (cleaned up).[1]

Finally, the court concludes Defendant's decision to provide premium pay only to current employees was reasonable, and not arbitrary. Lexington Deputy County Administrator Chris Murrin testified in his Fed. R. Civ. P. 30(b)(6) deposition Defendant understood it had finite resources and wanted to utilize no more than 14.2 percent of its ARPA distribution for premium pay. Def.'s Mem. in Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Ex. 2), ECF No. 43-2 at 2. According to Currin,

> The more we expand that pool, the less resources that we were going to give to our current employees. There is no benefit to the County to provide premium payments to employees that are no longer employed with Lexington County. Current employees, all right, as we outlined, people who continue to face, you know, that greatest risk, we wanted to provide our current employees with as much – with as much of these resources as – as – as we could. We thought it out. It was logical. It was reasonable. It made sense. We drew that line. It was presented, and that's where we landed.

*Id.*

Currin also testified Defendant considered the

> administrative efforts that the human resources department would have to go through in trying to track down, contact – you're talking about setting up direct deposits, mailing checks. The sheer administration of that is just – for a department that has four people and that administers payroll, it was just – it's not reasonable and feasible, you know – . . . – to – to administer that.

*Id.* at 3-4.

Currin provided an affidavit attesting Defendant was aware of its employee turnover, and that

---

[1]The court observes the definition of "eligible workers" in 31 C.F.R. § 35.6 also envisions the possibility employers could use their discretion to award premium pay only to eligible workers who were currently employed and, thus, continued to "maintain continuity of operations."

a large number of employees would work during the measurement period yet not be employed on the date of payment. According to Currin, 376 former employees worked during the measurement period and left employment prior to the first premium pay date of October 31, 2021. In addition, 427 former employees worked during the measurement period and left employment prior to May 13, 2022. Def.'s Mem. in Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Ex. 1), ECF No. 43-1 at 4-5. Currin estimated the addition of these former employees to the monies segregated for premium pay would have reduced the first payout from $5,010.00 per employee to $3,975.00 per employee. The second payout would have reduced premium pay from $4,617.00 per employee to $3,608.00 per employee. *Id.* at 5-6.[2]

Defendant's determination to exclude otherwise eligible workers not still employed at the time the funds were paid rests on a reasonable basis. Defendant did not violate Plaintiffs' right to equal protection under the South Carolina Constitution. Plaintiffs' remaining causes of action fail because Plaintiffs cannot claim entitlement to premium pay.

## IV.  CONCLUSION

For these reasons, the court grants Defendant's motion for summary judgment, ECF No. 38, and denies Plaintiffs' motion for summary judgment, ECF No. 37.

**IT IS SO ORDERED**.

Columbia, South Carolina  
April 12, 2024

s/ Cameron McGowan Currie  
CAMERON MCGOWAN CURRIE  
Senior United States District Judge

---

[2]In further support of Defendant's contention its decision to disburse ARPA funds solely to current employees was rational and not arbitrary, Defendant cites numerous governments that purportedly imposed "employed on date of payment" restrictions. Mot. for Summ. J., ECF No. 38-1 at 20-21.